Filed 9/15/20  P. v. Swan CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

MARCUS ANTHONY SWAN,

    Defendant and Appellant.

E071972

(Super.Ct.No. RIF1803776)

OPINION

APPEAL from the Superior Court of Riverside County.  Godofredo Magno, Judge.  Affirmed.

Kimberly J. Grove, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Annie F. Frazer and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

1

For years, defendant and appellant Marcus Anthony Swan sexually assaulted his stepdaughter, Jane Doe (Jane).  When she was 16 years old, she became pregnant and gave birth to a boy.  The trial court, citing Evidence Code section 1109, admitted evidence that defendant committed acts of physical abuse against his sons (Jane's half brothers).  On December 6, 2018, a jury convicted defendant of one count of forcible lewd acts and three counts of forcible rape.  The jury also found true the allegation that one of the rape charges involved great bodily injury.

On appeal, defendant contends:  (1) the trial court erred in admitting evidence of physical abuse against his sons; (2) the prosecutor committed prejudicial error during closing argument by telling the jury that pregnancy constitutes great bodily injury; and (3) the evidence is insufficient to support findings of force or duress.  We reject defendant's contentions and affirm.

## I.  PROCEDURAL BACKGROUND AND FACTS

### A.      *Defendant's Contact with Jane.*

#### 1.      *Behavior occurring prior to the dates of the charged offenses.*

While living in Ohio, Jane's mother told her defendant would be living with them and would be her "new dad."  At the time, Jane[1] was five or six years old.  Initially, Jane and defendant had a good relationship.  About one year later, defendant became very affectionate with Jane, pulling her close and hugging her for long periods, making her sit on his lap, touching and kissing her forehead, and rubbing her hand or arm after she had

---

[1] Jane was born in September 1998.

fallen asleep. Jane thought defendant's behavior was "unusual." When she was seven years old, the touching became more serious. Defendant started kissing her on her lips and groping her a few times a week, with intermittent periods when he would leave her alone. He told her it was "okay to touch in this way or he's trying to teach [her] something." Jane noticed that defendant had an erection when he was around her. Around this time, defendant started getting into bed with her, putting his arm around her, and just lying there; she could feel his erect penis against her body. If she tried to say something, defendant would tell her, "shh," or say he loved her and nothing was wrong. Although Jane knew defendant's actions were inappropriate, she did not tell anyone because she was "scared." She "didn't want anything happening to [her] family." Generally, she did what defendant wanted because she "knew that he wasn't anyone to mess around with." Thus, she "would just listen and go along."

2. *Count 1—forcible lewd acts on a child* (*09/16/07 – 09/15/09*).

Jane testified to three specific incidents occurring during this period:

The first incident happened when the family moved back and forth between California and Ohio, eventually remaining in California. On one occasion, defendant took Jane (age 8 or 9) to a hotel in Hollywood, telling her mother it was a "dad/daughter date." That night, defendant got into Jane's bed, laid down behind her, moved her underwear to the side, and rubbed his erect penis between her thighs for about 10 minutes, until he ejaculated. This was not the first time defendant had engaged in this behavior. Afterward, he told her that it "was just another way of showing [her] affection

3

and that [she] shouldn't be afraid of doing that." However, he also said that he did not "want [her] going out and doing it with anybody else and getting pregnant."

According to Jane, defendant disciplined her by hitting her head, grabbing her shirt, or taking things away from her. If she wanted her things back, he made her do sexual things. She testified defendant would tell her why she was in trouble, then at night when everyone was asleep, he would get into her bed, grope her, and ask if she was ready or in the mood. If she said no, "he would not stop coming into [her] room until he got what he wanted." Jane was afraid, but she felt like she could not stop defendant because he was "almost a 300-pound man." Also, he told stories about "the people he had power over, the jobs that he's had, where he's lived before, the contacts that he's had," and his gang connections. He said he could have her "beat up or shot if he got that upset." Additionally, Jane heard defendant threaten her brothers, and she saw him hit them with a belt or his hand. Jane noticed defendant's treatment of her family would get worse when she refused his sexual abuse. He told her that if she disobeyed him, she would open a "can of worms" that she could not close because she did not know who she was "'messing with'" and "no one's gonna believe [her]." When Jane refused to do what defendant wanted, he told her that if they were in the Middle East, she would be "stoned, hung and lashed."[2]

---

[2] When defendant entered their lives, Jane and her mother converted to Islam because defendant was Muslim. Later, defendant became a Christian and married Jane's mother in a Christian ceremony.

4

The sexual abuse escalated when the family moved to an apartment in Riverside. The second incident occurred one night after defendant had left her room and was talking to her mother. Jane was lying on the edge of her bed. Defendant looked back in the room, told her to turn the light off, and reminded her to "not" sleep in her clothes.[3] He came back into her room around 10:30 p.m. to make sure her clothes were off. He closed the door, got on her bed, pulled the covers down, and rubbed her back. He told her to take off her bra. He got behind her, pulled his underwear down, and started grinding against her. Jane moved her arms to try to keep him from touching her chest, but he told her to stop because she was making him mad, and he continued to reach around. Jane eventually felt something warm and sticky run down her leg. Defendant got a damp towel and wiped off her leg. He told her he still loved her, and she should not think of him any differently. While living in that apartment, defendant molested Jane once or twice a week.

From 2011 to 2012, when Jane was 13 to 14 years old, the family lived in a home on 14th Street. The third incident occurred one night when defendant came into Jane's bedroom and touched her vaginal area with his fingers. She faced away from defendant in a fetal position. She held her legs together so tight, she was hurting. Defendant told her to stop "squeezing" so it would not hurt as much. He walked out of the room and,

---

[3] Defendant had a "big rule about nobody sleeping in their clothes."

5

shortly thereafter returned, locked the door,[4] and turned off the lights and the television. He got into bed behind Jane, lifted her shirt, pulled down her shorts and underwear, and rubbed his erect penis against her vaginal area. Jane felt his penis "kind of slip past" her "entrance," and she "jolted" and started crying. Defendant told her to stop resisting but, after a few minutes, he pulled away and "started holding himself." Jane testified she did not tell anyone about defendant's actions because he threatened to have her "beat up by somebody that he knew" or that she would "eventually . . . be dead."

### 3. Count 2—forcible rape (09/16/12 – 09/15/13).

Shortly after Jane turned 14 years old, defendant came into her room with Vaseline. He put the jar down next to her, told her to pull her pants down, and left the room. When he returned, Jane heard him open the Vaseline jar. He had pulled down his underwear and put Vaseline on himself, telling Jane that it would stop her from hurting. It was dark in the room, and Jane knew what was going to happen. She had already had her period, and she was afraid of getting pregnant. Defendant got behind Jane, grabbed her hip with one of his hands, put his penis between her vaginal lips, and started thrusting back and forth between her legs. Jane had never had sex before, but she knew what sex was. Jane said it hurt when defendant penetrated her vagina. She tried to scoot away, but he held her and told her to stay there. Jane was crying because of the pain, but defendant continued for "a couple minutes." When he was finished, he got a towel, wiped off Jane,

---

[4] Jane's mother knew that defendant would go into Jane's room (and close the door) whenever "he felt like it," but if she told him not to do it, he "said it was his house. He could go where he wanted."

and told her it was okay, not to worry. He patted her on the back and told her to go back to sleep. After defendant left, Jane went into the bathroom and put a cold rag between her legs to soothe the pain. She testified that she was afraid during the incident, explaining, "I was afraid that if I fought back, he would do something or hit me. If I had got up and told my mom, he would do something to her. I just—I was afraid of being impregnated. I was afraid of being hit. I was afraid of him, period."

4.     *Count 3—forcible rape* (*09/16/13 – 09/15/14*).

When Jane was 15 years old, her family was homeless and often stayed in shelters. Defendant would take her to hotels to sexually assault her. On one occasion, while they were staying at the Path of Life Shelter, she heard defendant tell her mother that he and Jane were going to a hotel without the rest of the family because he needed to rest, there were only two beds, and the boys would act up. Jane was uncomfortable with the idea because she "knew what was gonna happen."

Defendant purchased food on the way and brought it with them into the hotel room. Inside the room, he told her that after she had eaten, he wanted her to take her clothes off. Jane testified, "And he told me to get ready and, this time, he wants me to be more free and to not fight back, to show him that I am mature, and I can be a woman because I'm almost 16." Jane was upset and did not respond. Defendant asked her questions "like, why [was she] acting like this, . . . [and] why [was it] so hard for [her] to listen to [him]?" He told her he was not trying to hurt her and wondered why she did not understand why he was doing this. He turned the lights off, sat next to her, and started

7

taking her shirt off. He continued talking to her, trying to make her understand why he was doing this. He stopped, said never mind, and got into the other bed.

When Jane laid down on her bed, defendant turned the bathroom lights and television off and got in her bed. She had her legs crossed, he told her to stop, and said that she was "pissing" him off. He pulled down her clothing so that she was only wearing her underwear and made her take off her bra. Jane was "about to cry"; she knew she could not run outside and tell anyone because they were not in a good area, and she did not know anyone nearby. Defendant continued to lecture her, saying she did not know how good she had it, he was taking care of all of them, and he could have left them. He also told her that she was disobedient, disrespectful, and closed-minded. Defendant said they were not "blood" so it did not matter. As she tried to scoot away, he "gripped the side of [her] and . . . flipped [her] back." He said it would not hurt this time, and he had vaginal intercourse with her; it "went on for, like, a good hour." When it was over, Jane took a shower. They had intercourse again the next morning before they left the hotel.

> 5.     *Counts 4 and 5—forcible rape (09/16/14 – 09/15/15).*

In or about March 2015, when Jane was 16 years old, she got pregnant. She believed it happened when defendant had raped her at a hotel in San Bernardino.[5] She described it as "the worst penetration" that had happened. When they got to the hotel, defendant told her to "relax" and that he was "not gonna start anything right now." Later,

---

[5] Defendant also had intercourse with Jane in Riverside around the same time. Defendant testified that the pregnancy was the result of consensual sex in Riverside.

he got into her bed and told her to take off her pants. When she just laid there, he got mad and "started going off on [her] again." Jane was facing away from defendant. He pulled up her shirt, so it was around her neck, moved her thighs to spread her legs in a "V" position, and penetrated her, ejaculating inside. He became mad and forceful because Jane was not moving. Afterward, Jane saw blood spots on the sheets. She sat in the bathtub because her vagina was sore, and it made her feel better.

When she realized she was pregnant, defendant told her it was her choice to get an abortion, "but [they] didn't have the money." He told her she "could just say that [she] had . . . met somebody." She gave birth to a boy in November 2015.

6. *Events occurring after the dates of the charged offenses.*

Within a few months of the birth of Jane's son, defendant resumed sexually assaulting her. At first, he raped her once a week or once every other week, but later the rapes increased to two or three times a week until March 2018. Although Jane tried to say no and physically resist, she was still afraid of defendant.

On March 17, 2018, defendant and Jane argued after she told him she would no longer have sex with him. He accused her of "overreacting, that it didn't have to be like that, that [she] could leave but keep everything between [them] a secret." When Jane said she no longer wanted to live in the house, defendant told her that her son would be taken away because she had nowhere to go. Jane's mother walked in while they were arguing, and defendant claimed Jane was "being disrespectful."

A few days later, defendant tried talking to Jane. He explained that what he was doing was not bad because they were not related. He told her he was fed up with her, and

9

she would be opening a "can of worms" because she was "taking it out of proportion." Later that day, Jane told her mother that defendant had been molesting her. When her mother asked if defendant was the father of Jane's son, she "nodded her head and said yes and started crying."

About one week later, when Jane's mother was away from the house, defendant went into Jane's bedroom, got into her bed, and tried to molest her. She told him not to touch her. When he did not stop, she moved his hand and kicked him away. Defendant told her to stop, and he grabbed her leg. He warned, "you're fucking up, you're fucking up." Jane screamed at him to leave her alone and stop touching her. Defendant finally left the room. Jane left the house and called the police to report the abuse. When Jane's mother returned home, defendant told her that she did not "need to hear [Jane's] side, just [his] side is what needs to be heard." Defendant stated, "[m]ine is the only one that counts." He added that she should "just be quiet," and "drop it," or else she would "open a can of worms that [she] couldn't close."

DNA analysis confirmed that defendant is the biological father of Jane's son.

B.      *Expert Testimony on Child Sexual Abuse Accommodation Syndrome* (*CSAAS*).

Dr. Jody Ward, a clinical psychologist, testified that CSAAS is helpful in understanding why children do what they do in response to sexual abuse. She stated there are five elements of CSAAS:  secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction or recanting; however, not all children react the same way, so an abused child would not necessarily

10

display all of those traits. She had not interviewed any of the witnesses in this case and had not read any transcripts of testimony in the case.

    *C.*    *The Uncharged Prior Acts.*

The People presented evidence that defendant had committed prior, uncharged assaults against his three sons: MJ, who was 13 at the time of the trial; MS, who was 11 at the time of the trial; and KS, who was nine at the time of the trial. Defendant began physically disciplining MJ when he was about five or six years old. If he broke house rules, such as going into the kitchen when he was not supposed to, going outside without permission, or failing to do his chores, defendant would whip him with a belt on his backside. MJ opined that defendant sometimes hit him with the belt for no reason. As MJ got older, the punishment became more frequent. Defendant would slap him across the mouth or punch him in the chest, knocking him to the floor. MJ was afraid of defendant and afraid of what would happen if he was disobedient because defendant claimed to have been in a gang. MJ saw defendant hit Jane's son twice with a belt when the baby was two years old.

MS described defendant as nice but sometimes scary because he would whip MS and his brothers with a belt. MS explained that defendant would make the boys fight each other or play games, and the winner would receive fake money. The boys then had to use the fake money to pay "fines" when they got into trouble. If they did not have enough money to pay the fine, defendant would "whip" them with a belt. MS recalled defendant hitting him with a belt when he was three years old. The physical punishment increased as MS got older, and the boys were disciplined if they talked while defendant

11

was on the phone, if defendant thought they had taken money from his wallet, or if they talked back. Defendant punched MS in the chest when he was 10 years old. When Jane's son was two years old, MS saw defendant hit him with a belt.

KS testified that defendant always hit KS and his brothers, multiple times, with a belt[6] if they were playing outside without permission or staying in the bathroom too long. KS believed defendant would also hit him for no reason. During a single beating, defendant hit KS 13 times, MS 15 times, and MJ about 20 times. Defendant also punched KS in the chest. One time, KS was washing Jane's son's feet in the bathroom. When KS stopped, the baby cried because he liked the feeling of the water on his feet. Defendant heard the baby crying, went into the bathroom, yelled at KS, and pushed his head against the wall. On another occasion, defendant removed KS from the bathroom by grabbing the back of his neck and throwing him out. KS saw defendant hit his brothers, and he knew that Jane also saw defendant hit them. KS observed marks on MJ's back from defendant whipping him with a belt, and he observed defendant go into Jane's room at night and close the door, about four times a week. KS heard defendant yell at his mother, call her names, and say he was going to divorce her. KS confirmed that the boys received fake money, and defendant would "fine" them as punishment. Defendant always imposed a fine that was more than the money they had, so the boys would also get physically punished.

---

[6] One day while defendant was "whipping" the boys, his belt broke, so he "got [their] mom's belt" and continued to "whip" them.

Jane's mother testified that defendant would get extremely angry over little things, like when she lost the keys to their new place. He told her that she "had 24 hours to find them or he was divorcing [her]." She recalled defendant's mood would change with Jane: "[I]t would be good one moment, and the next minute he would be mad about something, and just out of nowhere, but you don't know why."

### D. Defendant's Testimony.

Defendant testified he never touched Jane until the end of 2015, when they had "consensual sex." Defendant claimed it only happened once and said he did not "feel too good about it." On cross-examination, defendant added they also had "consensual sex" once when Jane was 16 years old, once when she was 18 years old, and three times when she was 19 years old, for a total of five times. Regarding their argument in March 2019, he claimed it was a result of his desire "to tell the truth about the baby." He testified, "She got mad about it and stuff and called me a liar and told me to get out of her room."

The prosecutor played portions of defendant's interview with law enforcement. In the interview, defendant initially denied ever touching Jane. When asked if he was the father of Jane's son, defendant said he was not, but that the DNA would match his because he was related to Jane's father. After the detective advised defendant that the DNA would show who was the father, defendant exclaimed, "I didn't rape her man. [¶] . . . I didn't rape her—I didn't rape her at all." He claimed Jane approached him, saying that she "wanted to have a baby by [him] 'cause she liked little [MJ]," and she convinced him to have sex with her and keep the fact that he was the father of her child a secret.

13

*E.    The Charges.*

By amended information filed October 24, 2018, defendant was charged with one count of forcible lewd acts on a child under 14 years (Pen. Code, § 288, subd. (b)(1), count 1), and three[7] counts of forcible rape (Pen. Code, § 261, subd. (a)(2), counts 2, 3, & 5).  On December 6, 2018, the jury convicted defendant of forcible lewd acts on a child and three counts of forcible rape.  The jury also found true the allegation that each of the rape charges involved a minor 14 years or older (Pen. Code, § 264, subd. (c)(2)) and that one of the rape charges involved great bodily injury (Pen. Code, § 667.61, subd. (*l*)).  On January 7, 2019, the trial court sentenced defendant to life without the possibility of parole, plus 30 years in state prison.

## II.  DISCUSSION

*A.    Admission of Defendant's Uncharged Acts of Domestic Violence on His Sons.*

Defendant contends the trial court abused its discretion in permitting his sons (the boys) to testify that he would hit them with a belt or his hand and shove them against the wall.  He argues this testimony went beyond anything permitted by Evidence Code section 1109 and, instead, constituted precisely the sort of character based portrait that is prohibited by Evidence Code section 1101, subdivision (a).  We conclude the testimony was properly admitted.

---

[7] The amended information contained a total of four counts of rape; however, two of the counts (counts 4 & 5) related to a single incident that resulted in Jane's pregnancy. They were charged as alternative counts because it was unclear whether she conceived in San Bernardino County (count 4) or Riverside County (count 5).

14

*1.    Additional factual and procedural background.*

Prior to trial, the prosecutor moved to admit evidence of defendant's physical abuse of the boys as propensity evidence under Evidence Code section 1109 on the grounds Jane falls within a certain category, and that category is defined by Family Code section 6211. The prosecutor also wanted to admit evidence that the children's mother observed this physical abuse but did not intervene because of her fear of defendant. Defense counsel objected, arguing the prejudice of admitting the evidence would substantially outweigh its probative value because the corporal punishment or regular discipline within the family did not qualify as child abuse and was never charged as child abuse. The trial court found that Jane's "knowledge of physical violence or threat of violence as a form of discipline with her and her siblings was relevant as a contributing factor to the credibility of [Jane's] fear of the defendant." However, the court cautioned that the "trial can't be about those other bad acts."

As set forth *ante*, the boys testified about defendant's acts of domestic violence. After the close of evidence, the trial court instructed the jury on how to consider propensity evidence. "The People presented evidence that the defendant committed the crime of child and sexual abuse that was not charged in this case. This crime is defined for you in these instructions. [¶] You may consider this evidence only if the People have

proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense. . . . [¶] . . . [¶] If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit Lewd or lascivious conduct by force or fear upon a child under 14 years old and Rape by force, fear or threats, as charged here. If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Lewd or lascivious conduct by force or fear upon a child under 14 years old and Rape by force, fear or threats. The People must still prove each charge beyond a reasonable doubt."

During closing argument, the prosecutor referred to defendant's physical abuse of his sons and referenced the instruction that told the jury it could use the evidence to find

16

that defendant was disposed or inclined to commit sexual offenses.**8** Using the Evidence Code section 1109 evidence, the prosecutor argued that Jane accepted the sexual assaults and molestation so defendant would not "take it out" on her family.

---

**8** "And what are we talking about? We're talking about the defendant's character for violence, force, fear, duress, and menace. As her father, the defendant has committed—and this is what is in the evidence—the following acts on (Jane) and her family. Verbal abuse, unfair punishment. Think about that point system, where that cash—oh, that seems so innocent; right? That seemed like such good parenting, until you found out actually how it works. It's all—why even do that? Why give them money, and whenever they do something bad, fine them just a little bit more than what they have? Why do you give them hope? It's even more cruel than just beating them. Just beat them then. Why go through this ploy? Because it was enjoyable? Why? That's what he did. [¶] Retribution for talking about [*sic*]. Mental/emotional cruelty. Violent outbursts. Exercised absolute control. Like, he says, You don't need to listen to her side. Just my side. [¶] . . . [¶] . . . Repeated and prolonged whipping with the belt. . . . He's hit those kids so much with the leather belt, . . . that the belt broke? [¶] . . . [¶] The belt broke. So what did he do? He used his wife's belt. Repeatedly. [¶] Here's a weird thing about beating children, folks. The law gives us, adults, power to beat and hit one class of People—children. Isn't that kind of weird? . . . But in the name of discipline, in the name of raising your children, the law recognizes, okay, you can discipline them using force. Okay? If necessary. But the law says, and we all say to each other, you better not abuse that power. If you do, we are holding you accountable. Slaps to the face, punching to the face and the body. Slamming a child's head against the wall, 'cause he was in the bathroom too long, 'cause he went in helping [Jane's son]? . . . Threatening to divorce. That's on [Jane's mother]; right? Threatening to kill. We can't understand . . . unless we followed her. But that is how he accomplished the molestation and sexual assault on (Jane). This is how. Like, verbal commands. In that environment, verbal commands. Those commands are not 'please' and niceties. These are commands that you must obey. Threats of beating. You're about to open a can of worms. You want to start this? I'll finish it. These are the things he would say when she would say, 'Leave me alone.' Express that she's not consenting. Threats to kill. Threats of gang violence . . . . Threats of retribution to family. That one is not even a threat. She saw it happening. When she would refuse him sex, he would take it out. He would get irritable, start taking it out. Just watching this happen. I need to do this. I need to be the one to suck it up and get raped so that my family is safe."

### 2. *Applicable legal principles.*

Evidence Code section 1109 is designed to allow admission of evidence that is otherwise inadmissible under section 1101, subdivision (a), i.e., evidence of a person's character or a trait of character to prove propensity or criminal disposition. "[I]n enacting Evidence Code section 1109, the Legislature found that in domestic violence cases evidence of prior acts is particularly probative in demonstrating the propensity of the defendant. '"The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of *dominance and control*, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked."'" (*People v. Cabrera* (2007) 152 Cal.App.4th 695, 705-706 (*Cabrera*), italics added.)

Evidence Code "[s]ection 1109 applies if the offense falls within the Family Code definition of domestic violence even if it does not fall within the more restrictive Penal Code definition." (*People v. Ogle* (2010) 185 Cal.App.4th 1138, 1144 (*Ogle*); see *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1313 ["Like . . . sex crimes . . . , domestic violence is quintessentially a secretive offense, shrouded in private shame, embarrassment and ambivalence on the part of the victim, as well as intimacy with and intimidation by the perpetrator. The special relationship between victim and perpetrator in both domestic violence and sexual abuse cases, with their unusually private and intimate context, easily distinguishes these offenses from the broad variety of criminal

18

conduct in general. Although all criminal trials are credibility contests to some extent, this is unusually—even inevitably—so in domestic and sexual abuse cases, specifically with respect to the issue of victim credibility."].) As the *Ogle* court explained, Evidence Code section 1109 "defines domestic violence as having the meaning . . . set forth in Family Code section 6211, so long as the act occurred within five years of the charged offense, subject to a hearing under Evidence Code section 352." (*Ogle*, at p. 1143.) "Family Code section 6211 defines domestic violence to require abuse and Family Code section 6203, subdivision (d) defines 'abuse' to include 'engag[ing] in any behavior that has been or could be enjoined pursuant to [Family Code s]ection 6320.'" (*Ogle*, at p. 1144.) Family Code section 6320, subdivision (a), authorizes the court to enjoin a party from engaging in a wide range of misbehaviors, including "molesting, attacking, striking, . . . threatening, sexually assaulting, battering, . . . the other party, and . . . of other named family or household members."

In short, sexual abuse of a child falls under the umbrella of domestic violence. When the abuse involves a family or household member, evidence of uncharged domestic violence is admissible, subject to Evidence Code section 352. (*People v. Jennings*, *supra*, 81 Cal.App.4th at pp. 1313-1314 [Evidence Code "[s]ection 1109 conditions the introduction of prior domestic violence evidence on an evaluation under [Evidence Code] section 352 of whether the evidence is more probative than prejudicial. A careful weighing of prejudice against probative value under that section is essential to protect a defendant's due process right to a fundamentally fair trial."].) "When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh

19

the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers 'substantially outweigh' probative value, the objection must be overruled. [Citation.] On appeal, the ruling is reviewed for abuse of discretion." (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.)

### 3. Analysis.

Defendant contends the "acts of physical discipline involving the boys were in no way similar to the charged sex offenses involving Jane. Consequently, proof that [he] physically disciplined his sons did not tend to prove that he sexually assaulted Jane, and the probative value of the evidence was, therefore, non-existent." We reject this contention.

Here, the prosecution was tasked with proving defendant sexually assaulted Jane "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury." (Pen. Code, § 261, subd. (a)(2); see § 288, subd. (b)(1).) The boys' testimony was highly probative of Jane's fear of defendant based on his propensity to react violently when others did not obey him. "As the court in *People v. Hoover* [(2000)] 77 Cal.App.4th [1020,] 1027-1028 . . . , noted in enacting Evidence Code section 1109, the Legislature found that in domestic violence cases, evidence of prior acts is particularly probative in demonstrating the propensity of the defendant. '"The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity

20

inference, the escalating nature of domestic violence is likewise masked.""" (*Cabrera*, *supra*, 152 Cal.App.4th at pp. 705-706.)

The probative value of the boys' testimony lies in their description of an environment of mental and physical abuse wherein defendant possessed the authority to control and discipline every household member for any perceived act of disobedience. This environment contributed to the fear Jane felt when defendant was molesting and raping her. Her knowledge that defendant used physical violence on her brothers, or threatened to use physical violence on them or herself, bolstered the credibility of her fear of what defendant would do if she did not comply with his demands. While the physical abuse of the boys was different than the sexual abuse of Jane, both types of abuse demonstrated a larger scheme of dominance and control, defendant's temperament and behavior, and his propensity to commit acts of domestic violence. (*Cabrera*, *supra*, 152 Cal.App.4th at pp. 705-706.)

Additionally, we reject defendant's claims that (1) the evidence increased "the likelihood of confusing the issues" because defendant "was never charged with, much less convicted of, child abuse," and (2) the evidence inflamed the emotions of the jurors, causing them to prejudge him based on other misconduct. To begin with, we find no danger of confusion of the issues. The purpose of the boys' testimony was not to establish defendant's culpability for the offenses committed against Jane. Rather, it was to illustrate defendant's temperament and controlling behavior in response to *any* perceived act of disobedience and to establish Jane's knowledge of defendant's physical abuse of her brothers to explain her fear of him. More importantly, the evidence was less

21

inflammatory than the evidence of the yearslong sexual abuse and rape of Jane. The boys' testimony was brief, and there is no reason to believe it elicited an emotional response greater than that which the jury would have experienced from Jane's detailed testimony regarding the years of sexual abuse at the hands of defendant. The abuse suffered by the boys (being hit with a belt) was far less serious in nature and quality when compared to the abuse suffered by Jane (molestation and rape). Moreover, the jury was properly instructed on how to consider the uncharged acts of physical abuse of the boys. We must presume the jury understood and followed the instructions. (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)

In short, we uphold the trial court's admission of defendant's prior incidents of domestic violence involving the boys because their probative value outweighed any potential prejudice. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.)

B.  *No Prosecutorial Error.*

Defendant contends the prosecutor "directly and incorrectly informed the jurors that pregnancy was regarded by law as great bodily injury." The People assert the prosecutor "correctly argued the reasonable inference that pregnancy can constitute great bodily injury." We agree with the People.

22

*1.    Additional factual and procedural background.*

Without objection, the jury was instructed on great bodily injury on a minor 14 years of age or older.[9]  During closing argument, the prosecutor referred to the great bodily injury enhancement accompanying the rape charges (counts 4 & 5), one of which resulted in Jane's pregnancy, stating:  "The allegation that in committing 4 or 5, she was pregnant, which is great bodily injury."  Defense counsel objected on the ground the prosecutor misstated the law.  The court replied:  "It's incomplete.  But, again, I have provided you with the law.  Follow my instructions on the laws."

Later, the following transpired:

"[THE PROSECUTOR]:  Great bodily injury.  The law says more than minor or moderate harm.  So I need to talk about this more; that carrying a child to pregnancy all the way through.  So, basically, the test I do is this.  If the teeny happens, and you look at it and say, Oh, let's put a Band-Aid on it.  Put some Vaseline.  You're looking at minor harm.  Okay?  If you look at it, say, Maybe you should go to the hospital, maybe not.  You may be looking at moderate harm.  Let's say you got, like, a gash.  You need stitches.  All right?  You're looking at more than moderate harm.  You would go to the

---

[9]  "If you find the defendant guilty of the crimes charged in Counts 4 and 5 of Rape by force, fear or threats, you must then decide whether the People have proved the additional allegation that the defendant personally inflicted great bodily injury on Jane Doe . . . , a minor 14 years of age or older, during the commission of that crime.  [¶] Great bodily injury means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.  [¶]  Committing the crime of Rape by force, fear, or threats is not by itself the infliction of great bodily injury.  [¶]  The People have the burden of proving each allegation beyond a reasonable doubt.  If the People have not met this burden, you must find that the allegation has not been proved."

hospital; right?  Is there anybody who, when they are pregnant says, I'm going to walk this one off?  No.  That is more than minor or moderate harm.  I know it's weird saying 'pregnancy is injury.'  That kind of offends us a little bit too.  That's also weird.  But that's what the law calls it.  And, if anything, the very least, when that baby was born, she got a tear; right?  And you have to—right there.  Okay?  But that pales in comparison to the consequences of this pregnancy.  It is great bodily injury.

"[DEFENSE COUNSEL]:  Objection.  Misstates the law.

"THE COURT:  Overruled."

During rebuttal, the prosecutor referenced the verdict forms for each count. Regarding counts 4 and 5, he stated:  "You're going to see an allegation under Count 4 and 5.  Again, that says, that in committing that rape, he committed great bodily injury. That's a pregnancy.  Circle the one that says, 'true.'  Sign it and circle it.  And return a verdict of guilty.  Because that is the only verdict supported by the evidence, the whole evidence, and the law in this case."

### 2. *Applicable legal principles.*

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument.  [Citation.]  However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].'  [Citations.]  To establish such error, bad faith on the prosecutor's part is not required.  [Citation.]  '[T]he term prosecutorial "misconduct" is somewhat of a misnomer

24

to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' [Citation.]

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

### 3. *Analysis.*

Our Supreme Court has held that a finding of great bodily injury can be supported by evidence of "a pregnancy without medical complications that results from unlawful but nonforcible sexual conduct with a minor . . . ." (*People v. Cross* (2008) 45 Cal.4th 58, 61 (*Cross*).) In *Cross*, the defendant impregnated his 13-year-old stepdaughter, and she had an abortion at 22 weeks with no medical complications. (*Id*. at pp. 61-62.) The jury convicted the defendant of a lewd act (Pen. Code, § 288, subd. (a)) and found true the allegation that he inflicted great bodily harm. (*Cross*, at p. 63.) On appeal, the defendant contended a pregnancy without complications or other injuries cannot support a great bodily harm enhancement, and the California Supreme Court rejected the contention. (*Id*., at pp. 65-66 ["[A] pregnancy without medical complications that results from nonforcible but unlawful intercourse can . . . support a finding of great bodily injury."].) The Supreme Court concluded: "We need not decide in this case whether

25

every pregnancy resulting from unlawful sexual conduct, forcible or otherwise, will invariably support a factual determination that the victim has suffered a significant or substantial injury, within the language of section 12022.7. But we conclude that here, based solely on evidence of the pregnancy, the jury could reasonably have found that [the] 13-year-old [victim] suffered a significant or substantial physical injury."[10] (*Cross*, at p. 66.)

Here, the prosecutor's argument that Jane's pregnancy supported the great bodily injury allegation was not contrary to the jury instruction, nor a misstatement of the law. The prosecutor never suggested that "pregnancy was, as a matter of law, great bodily injury." Rather, he argued that Jane's pregnancy constituted great bodily injury. "Closing argument presents a legitimate opportunity to 'argue all reasonable inferences from evidence in the record.'" (*People v. Bolton* (1979) 23 Cal.3d 208, 212.) The prosecutor's position was a reasonable inference. (*Cross*, *supra*, 45 Cal.4th at pp. 65-66.)

Moreover, the prosecutor's argument was not contrary to the jury instruction. Even if it were, "'[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an

---

**10** We note that Justice Corrigan (joined by C.J. George) would have gone further. Recognizing the impact that pregnancy has on a woman's body, she reasoned: "'Pregnancy can have one of the three results—childbirth, abortion or miscarriage. Childbirth is an agonizing experience. An abortion by whatever method used constitutes a severe intrusion into a woman's body. A miscarriage speaks for itself.' . . . [I]t is impregnation, necessarily causing one of three consequences, that is the basis for the injury. Because the impact of any pregnancy is so great, it is illogical to treat some pregnancies as trivial, or to suggest that juries could, somehow, determine that any criminally imposed pregnancy can be considered minor." (*Cross*, *supra*, 45 Cal.4th at p. 73 (conc. opn. of Corrigan, J.), fn. omitted.)

attempt to persuade.' [Citation.] '[P]rosecutorial commentary should not be given undue weight in analyzing how a reasonable jury understood . . . instructions. Juries are warned in advance that counsel's remarks are mere argument, missteps can be challenged when they occur, and juries generally understand that counsel's assertions are the "statements of advocates." Thus, argument should "not be judged as having the same force as an instruction from the court."'" (*People v. Cortez* (2016) 63 Cal.4th 101, 131-132; accord, *People v. Centeno*, *supra*, 60 Cal.4th at p. 676 ["'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former.'"].) Here, the court instructed the jury with the correct standard instruction on great bodily injury, and the jury expressed no confusion, nor asked for any clarification. Further, the jury was told: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." Additionally, in rebuttal argument, the prosecutor reminded the jurors that statements by attorneys "are not evidence," and they (the jurors) "must follow the law that [the judge] gives you."

Accordingly, we reject defendant's claim of prosecutorial error.

C.      *Sufficiency of Evidence of Force and Duress.*

Defendant contends the evidence was insufficient to prove that any of the relevant acts were committed by the use of force or duress. The People assert the convictions are amply supported by evidence of both force and duress. Because we conclude the convictions are amply supported by evidence of force, we need not rely on additional evidence of duress or other factors, e.g., violence, menace, and fear of immediate or

27

unlawful bodily injury with respect to these same counts. (Pen. Code, § 261, subd. (a)(2) ["Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [¶] [w]here it is accomplished against a person's will by means of force, violence, duress, menace, *or* fear of immediate and unlawful bodily injury on the person or another," italics added]; § 288, subd. (b)(1) ["A person who commits an act described in subdivision (a) by use of force, violence, duress, menace, *or* fear of immediate and unlawful bodily injury on the victim or another person."].)

### 1. Standard of review.

"In considering a challenge to the sufficiency of the evidence . . . , we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

### 2. Analysis.

Defendant contends "the evidence was insufficient to establish that any of the charged acts [(lewd acts on a child and forcible rape)] w[ere] committed by the use of force." We disagree.

The amount of force required to support a conviction for forcible lewd acts on a child is force above and beyond what is necessary to accomplish the lewd act itself. (Pen. Code, § 288, subd. (b)(1); accord, *People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005 ["acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves" satisfy the force requirement under § 288, subd. (b)(1)].) The amount of force required to support a conviction for forcible rape is enough to overcome the "person's will." (Pen. Code, § 261, subd. (a)(2); accord, *People v. Griffin* (2004) 33 Cal.4th 1015, 1025 [""force" plays merely a supporting evidentiary role, as necessary only to insure an act of intercourse has been undertaken against a victim's will'"]; *In re John Z.* (2003) 29 Cal.4th 756, 762 [forcible rape occurs when, during consensual intercourse, the victim objects and attempts to stop the act, and the defendant forcibly continues, despite the objection].)

Here, Jane testified she would lie in a fetal position facing away from defendant when he started touching her. He would "have his arm over [her], and he would pull [her] into him and with his pelvis." She tried to scoot away, but he overcame her resistance by holding her, and telling her to stay there, grabbing her hip, gripping her side, flipping her back, grinding his body onto hers and, on one occasion, moving her thighs to spread her legs in a "V" position to penetrate her. "Although resistance is not required to prove forcible sexual assault, the jury could reasonably have considered [Jane's] resistance in assessing whether defendant used force to accomplish the lewd act." (*People v. Babcock* (1993) 14 Cal.App.4th 383, 387 [finding the victim resisted when she "attempted to pull her hand away from his crotch"].)

From Jane's testimony, there is ample evidence the charged offenses were accomplished by force.

### III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                                              J.

We concur:


RAMIREZ
                          P. J.


FIELDS
                  J.